UNITED STATES, Appellant

v

WALTER H. GEBHART, Private, U. S. Marine Corps, Appellee

10 USCMA 606, 28 CMR 172

No. 13,052

Decided August 14, 1959

*Major Ted H. Collins* argued the cause for Appellant, United States.

*Lieutenant Colonel Remmel H. Dudley* argued the cause for Appellee, Accused.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Among other offenses, the accused was tried and convicted for stealing a camera from a fellow Marine, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. However, the findings of guilty were set aside by a board of review on the ground that evidence of the results of a search of the accused's effects and his later confession were improperly admitted. The Judge Advocate General certified the case to this Court for review on the following issue:

"Was the Board of Review correct in holding the actions of Acting Staff Sergeant Martin constituted an unlawful search which affected the legality of the subsequent authorized search."

Acting Staff Sergeant J. E. Martin was the Company Police Sergeant. On the morning of December 19, 1958, he made his regular inspection of the barracks. In Room 5 of Building 3, which housed newly arrived students to the Operational Communications Electronics School who had not yet been assigned to regular squadbays, he saw the accused. No one was supposed to be "in there" at that time. Proceeding with his regular routine of inspection, Martin observed "keys hanging through the hasp of the lock" of an unmarked wall locker. He asked the accused if he knew to whom the locker was assigned and received a negative reply. Martin took the keys and instructed the accused to inform "whoever it was in the room" that he had them. About 12:30 p.m., Private Koresian came to Martin's office in Building 3 to complain that he was unable to open his wall locker with his key. The two returned to Koresian's locker in Room 5. They tried Koresian's key in the lock without success, but one of the keys that Martin had picked up earlier fit. The locker was opened and Koresian discovered his camera was missing. All persons then in the room, the accused included, were ordered "to stand fast."

Martin went to Captain Reilly, the company executive officer, and related "exactly what had happened." According to the Captain's testimony, he was "authorized" as executive officer to

"order and conduct searches." He proceeded to Room 5; directed everyone to stand by his bunk; and then conducted an "inspection" of their effects by checking the wall and foot lockers and under the mattress of each man. In the course of the search, the accused told Captain Reilly that he had "lost" an electric razor. Nothing was found and the men were released to return to class.

During the "shakedown," Captain Reilly had found an open locker containing the personal effects of a man on leave. He told Martin to have the property clerk inventory and store the effects. Sometime between 2:00 p.m. and 3:00 p.m., Martin, Evans, the property clerk, and Evans' assistant, returned to Room 5 to take the property from the open locker. While Evans was so engaged, Martin, "just out of curiosity" and "one of those things," went through the room "squeezing" the laundry bags of the occupants "in case we accidentally missed over something." Over defense counsel's objection Martin testified that in one bag he "felt" a hard object which "could have been a camera and case." Martin knew he could "not legally conduct" a search without an officer. While his "normal" duties included checking laundry bags "for cleanliness," he had no specific authority to "search any possessions." He went for Captain Reilly and told him of his findings. The Captain accompanied him to the room. The laundry bag was opened and Koresian's camera was found. It was replaced in the bag. When the men were released from school, Martin had them "fall inside the room." Captain Reilly was called. He "started checking laundry bags," and the camera was extracted from the accused's bag.

Taken to Captain Reilly's office, advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, and warned "what he was suspected of," the accused said that he "did not take the camera." He indicated he was willing to go to the provost marshal's office and take a lie detector test. However, when he arrived at the provost marshal's office and was again advised of his rights under Article 31,

the accused admitted he "went into this man's locker and took his camera." A written confession was admitted in evidence over defense counsel's objection that it was the product of "an illegal search."

The rulings on the admissibility of the evidence were considered by the staff judge advocate in the post-trial review. He concluded Martin's conduct was legal. On review, however, the board of review held that Sergeant Martin's search was illegal and that it tainted the later search by Captain Reilly and the accused's confession. It set aside the findings of guilty on the larceny charge and reassessed the sentence on the basis of the findings of guilty.

Two separate avenues of support for the board of review's conclusion are marked out by appellate defense counsel. They first contend there is "some doubt" that Captain Reilly had "specific authority to search and seize." Hence, they argue, neither his initial nor his final search was a valid source of evidence. Their second argument follows closely the reasoning of the board of review.

The first position is untenable. The record of trial reflects testimony of Captain Reilly to the effect that he was "authorized to order and conduct searches." There was no objection to Martin's testimony or that given by Captain Reilly as to the first search ordered by the latter. No inquiry was made into the source of the asserted authority. Had there been an objection or inquiry, the exact basis of Captain Reilly's authority could have been established at trial level. Cf. United States v Sessions, 10 USCMA 383, 27 CMR 457. It is now too late to say there was no authority to search. United States v Webb, 10 USCMA 422, 424, 27 CMR 496.

The fact of authority being unassailable, our next inquiry must be directed to its exercise. Contrary to the view taken by some boards of review,[1] the

[1] United States v Toreson, 8 CMR 676, footnote 2; United States v Turks, 9 CMR 641, 645; see also United States v Worley, 3 CMR (AF) 424, 442, et seq.

exercise of the power to order searches is not unlimited. We recognized this in United States v Doyle, 1 USCMA 545, 548, 4 CMR 137, where we said:

". . . That there may be limitations upon the former's power, we do not doubt. Insofar as the power bears on criminal prosecutions, both trial courts and appellate forums are available to insure that the commanding officer does not abuse his discretion to the extent that the rights of an individual are unduly impaired."

While it is difficult to lay down a general rule applicable to every conceivable situation, it can be said ▬▬▬▬▬ ▮ with assurance that the ▬▬▬▬▬ ▮ exercise of the authority to search must be founded upon probable cause, whether the search be general in that it includes all personnel of the command or subdivision, or limited only to persons specifically suspected of an offense. United States v Doyle, supra; United States v Brown, 10 USCMA 482, 28 CMR 48. A search founded upon mere suspicion is illegal and the fruits thereof inadmissible. United States v Brown, supra.[2] To hold otherwise would require us to deny to military personnel the full protections of the United States Constitution itself. This, neither we, nor the Congress, nor the Executive, nor any individual can do.

Applied to the facts of the instant case, these basic concepts support the propriety of the initial ▬▬▬▬▬ ▮ search. Armed with authority to conduct searches aud confronted with a report that certain personal property had been stolen from an enlisted man's locker, Captain Reilly proceeded to conduct the familiar "shakedown" inspection of the effects of all personnel assigned to that room. Taking into consideration the freedom of access occupants of military quarters have to all parts thereof, this generalized type of search has long been re-

garded as reasonable. United States v Swanson, 3 USCMA 671, 14 CMR 89.

The board of review predicated its conclusion that Martin's search was illegal upon a finding that his "activities were conducted in an official, rather than a private, capacity." The following evidence gives substantial support to that holding: Martin had sufficient "direct disciplinary power" over the accused and the other occupants of the room to order them to "stand fast" while he called Captain Reilly; he had an office in the barracks; and persons quartered in the barracks reported any untoward matter to him. That, however, is not the end of the problem.

Martin testified that his search was for the purpose of determining whether "we accidentally missed ▬▬▬▬▬ ▮ over something" in the search authorized by Captain Reilly. It is arguable, therefore, that his further examination was not a separate independent action but merely an extension of the search ordered by Captain Reilly. On the other hand, Martin also testified that his action was simply the prompting of "curiosity"; an indefinable feeling which he described as "just one of those things." This testimony tends to indicate he was acting on his own initiative and without reference to the first search.

The authority to search is not ended with the closing of the door behind the agent. We suppose no one ▬▬▬▬▬ ▮ would seriously question the right of the agent to return to premises he just searched if, on passing through the outer door, he recalls that he had not searched the closet of an upstairs room. Under certain circumstances, the authority to search may include a return visit to the premises. See United States v Sessions, supra; United States v Hurt, 9 USCMA 735, 778–779, 27 CMR 3. As we observed in a different but parallel situation, a "series of related acts . . .

---

[2] Both the generalized and particularized types of searches are not to be confused with inspections of military personnel entering or leaving certain areas, or those, for example, conducted by a commander in furtherance of the

security of his command. These are wholly administrative or preventive in nature and are within the commander's inherent powers. United States v Brown, 10 USCMA 482, 28 CMR 48.

610

[can build] into a single" legal event. United States v Swigert, 8 USCMA 468, 472, 24 CMR 278; see also United States v Strand, 6 USCMA 297, 303, 20 CMR 13.

The evidence in the record of trial is susceptible of different findings of fact. The board of review did not consider the issue presented. Consequently, we cannot answer the certified question. We return the record of trial to the board of review for further consideration in the light of our opinion.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I concur with the Chief Judge to the extent that I believe the decision of the board of review should be reversed. However, I do not believe the action of the police sergeant was in contravention of the law or the Fourth Amendment to the Constitution. Assuming the actions of the sergeant constituted a search, there was nothing unreasonable about the method he employed.

The sergeant was assigned as company police sergeant, and the record shows his normal duties included the inspection and checking of laundry bags. These bags are in the open, tied to the foot of the beds, and they are repositories for soiled articles of clothing. They are the property of the Government, they are not furnished for the purpose of keeping all the personalized effects of the serviceman, and they are not intended to have the sanctity of the home, person, foot lockers or wall lockers. When used in barracks, they may be opened and inspected by the company police sergeant, who may note their contents and take appropriate action when they are made the repository for articles other than those prescribed. Certainly, when a police sergeant has the right to open and notice the contents of a laundry bag, he does not commit a trespass or invade the privacy of the possessor by merely feeling the outside covering to ascertain whether there are items placed therein which may be either contraband or secreted contrary to orders. Here the sergeant did not open the bag, so at the worst by touching he merely learned that an object which was the size and shape of a camera was in the accused's bag. While it is conceded he was looking for stolen property, his motive does not add to or detract from his authority.

There is some argument advanced that the record shows this sergeant exceeded his authority. If that were so, then his action might be illegal, but when the answers are considered in light of the broad sweep of the questions asked, together with the sergeant's testimony that his duties included checking and inspecting laundry bags and the fact that he would not characterize his act of checking as a search, it becomes clear the witnesses were merely stating that the sergeant did not have the right to conduct a wholesale search of any and all the belongings of the company personnel. That much is conceded by all, but there is no evidence which contradicts his authority to open and notice the contents of the barracks bag.

I would, therefore, answer the certified question in the negative and affirm the findings of the court-martial, but to effect a practical disposition of the case without prejudice to the accused I join the Chief Judge in returning the record to the board of review.

FERGUSON, Judge (dissenting):

I dissent.

In addition to other offenses, the accused was found guilty of larceny of a camera, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921. The findings of guilty with respect to this delict were set aside by a Navy board of review on the ground that evidence with regard thereto, admitted at the accused's trial, resulted from an illegal search and seizure. The Judge Advocate General of the Navy certified to this Court the question whether the board of review was correct in determining the search involved to be illegal.

The pertinent facts are uncomplicated and uncontested. Acting Staff Sergeant Martin was the Company Police Ser-

**611**

geant. Upon making his regular inspection of the barracks on December 19, 1958, he noticed the accused in Room 5. No one was supposed to be there. He also observed keys hanging from an unmarked wall locker and seized them, informing the accused that he should tell "whoever it was in the room" that he had them. At approximately 12:30 p.m., Private Koresian came to Martin and complained that he was unable to open his locker in Room 5. Martin and Koresian returned to the room and discovered that one of the keys which had been seized earlier fitted the locker. Koresian opened the locker and discovered his camera was missing. Martin instructed all personnel to remain in the room and reported the matter to the company executive officer, Captain Reilly. Reilly, whose testimony indicated he had authority to conduct searches, proceeded to Room 5 and searched the possessions of its occupants. Nothing was discovered.

Between 2:00 p.m. and 3:00 p.m., Martin returned to Room 5 in order to secure the personal belongings of a man absent on leave. "Just out of curiosity," he decided to check the occupants' laundry bags. Squeezing each of them, he felt an object in accused's bag resembling a camera and case. He again summoned Captain Reilly. The latter opened accused's laundry bag and found Koresian's camera. It was returned to the bag. After the occupants returned to the room, the bags were formally searched and the camera seized.

From the foregoing circumstances, it will be seen that the legality of Captain Reilly's second quest depends upon the propriety of the earlier search by Staff Sergeant Martin. An authorized search made as the result of information obtained through an earlier illegal investigation is infected with the taint of the earlier search and becomes also illegal. Silverthorne Lumber Co. v United States, 251 US 385, 40 S Ct 182, 64 L ed 319 (1920) ; United States v Ball, 8 USCMA 25, 23 CMR 249; Manual for Courts-Martial, United States, 1951, paragraph 152. Thus, we are faced at the outset with the basic issue of whether Staff Sergeant Martin's investigation of the laundry bags was an official action and, if so, whether it was properly authorized.

With regard to the initial proposition, it has been pointed out with respect to military searches that:

"An accused may only exclude from evidence the results of an illegal search 'conducted or instigated *by persons acting under authority of the United States.'* The mere fact that the searcher is a Federal employee, however, does not impose responsibility for his action upon the Government. He must have been acting in a law enforcement capacity. The necessity for this limitation is obvious; otherwise, military law enforcement agencies would be saddled with responsibility for the acts of all members of the armed forces, in whatever capacity." [Cobbs and Warren, Military Searches and Seizures, 1 Military Law Review 17 (DA Pamphlet 27–100–1 September 1958).] [Emphasis supplied.]

Thus, in United States v Volante, 4 USCMA 689, 16 CMR 263, we held a search by a post exchange steward of a subordinate's locker to be an inquiry by a volunteer, as he was motivated by a fear that he would be held personally responsible for missing property unless he was able to affix the blame elsewhere. And in United States v Rogan, 8 USCMA 739, 25 CMR 243, we upheld the search of a *lieutenant's* gas mask bag by a *master sergeant* who was the officer's subordinate and the victim's superior. There, we also noted that we equated searches by persons having direct disciplinary authority over the person searched to those conducted by law enforcement agents. United States v Rogan, supra, at page 742.

Viewed in the light of the foregoing precedents, I am certain the evidence of record clearly establishes that Staff Sergeant Martin's search was conduct of an official nature. He was the Company Police Sergeant; he was charged with the duty of inspecting the barracks; and he admittedly exercised disciplinary authority over the accused. Indeed, it was

he who initially reported the victim's loss and participated in Captain Reilly's subsequent investigation. Finally, his declaration that he checked the laundry bags "out of curiosity" should be considered in context, for then it becomes apparent that Martin intended to indicate only his dissatisfaction with the earlier failure to discover the camera and not that he was acting on the basis of personal inquisitiveness.

The question whether Martin was authorized to conduct a search is easily resolved. He was no longer acting under the aegis of Captain Reilly, for that officer had long since completed his search and returned to his office. The record is devoid of any circumstances indicating that Reilly in any way intended to continue his inquiry into the matter. That Martin had no separate authority to conduct the search is specifically admitted by him in the record and is also substantiated by Captain Reilly's testimony. Indeed, the contention of both these parties is that Martin did not conduct a search but merely "felt" of the accused's laundry bag.

Accordingly, I am of the opinion that Staff Sergeant Martin's discovery of the camera involved constituted an illegal search. Hence, Captain Reilly's later search was also illegal. United States v Ball, supra; Silverthorne Lumber Co. v United States, supra. As this was the position taken by the board of review, it necessarily follows that I would uphold its decision and answer the certified question in the affirmative.

The author of the principal opinion, however, does not answer the query presented to us. Admitting that there is substantial evidence to support the finding that Martin's action was official, he argues that there is also a basis for contending that his search, conducted two hours later, was a mere continuation of the earlier investigation carried on by Captain Reilly. Finding that the board of review did not consider this possibility, the record is returned for their reconsideration.

Not only is the record devoid of any testimony tending to support that contention, but it also affirmatively establishes the contrary. Martin re-entered Room 5 solely to secure another person's belongings in order that they might be safely kept pending that individual's return from leave. Both Martin and Captain Reilly stated that the former had no authority to make a search. Indeed, their contention, and that of the Government before the board of review and this Court, is that "feeling" of laundry bags did not constitute a search. The theory advanced in the principal opinion is indeed novel in the case. I suspect that the failure of the board of review specifically to discuss it in their opinion and the failure of counsel to advance it results from their inability to discern any factual basis, however tenuous, for it in the evidence.

Pretermitting the question whether the record supports the argument advanced by the Chief Judge, a reading of the board's opinion will disclose the statement that the "evidence of record . . . leaves little doubt that Acting Staff Sergeant Martin's 'bag squeezing' activities were conducted in an official, rather than a private, capacity and that the same had not, in fact, been duly authorized." No one can deny that this expressly stated conclusion has a substantial basis in the recorded testimony. We need go no further, for, unless we find that the board's action is erroneous as a matter of law, we cannot set it aside. United States v Alaniz, 9 USCMA 533, 26 CMR 313. By suggesting an alternative evidentiary theory on which affirmance of the findings may be based, we ignore the board's fact-finding prerogative and force upon it the product of our own thinking. I believe that more dignity should be accorded to the product of its members who, it must be remembered, are also legally trained. Hence, I am willing to assume they performed their duties properly and weighed all matters raised by the evidence in reaching their determination. Thus, I am unable to join in the ordered disposition of this case.

I would answer the certified question in the affirmative and uphold the decision of the board of review.