UNITED STATES, Appellee

v

RONALD PEURIFOY, Airman First Class, U. S. Air Force,
Appellant

No. 27,157

December 21, 1973

*Lieutenant Colonel James LaBar* argued the cause for Appellant, Accused. With him on the brief were *Colonel George M. Wilson* and *Colonel William E. Cordingly.*

*Captain Fred W. Kuhn* argued the cause for Appellee, United States. With him on the brief was *Colonel C. F. Bennett*

## OPINION OF THE COURT

DUNCAN, Judge:

Tried by military judge sitting alone, the appellant was convicted of two offenses of larceny of various items (specifications 1 and 2, Charge I), and one offense of wrongful possession of hashish (specification 2, Charge II).[1] The approved sentence provides for a dishonorable discharge, total forfeitures, confinement at hard labor for 2 years, and reduction to the grade of Airman Basic. We granted review on the following issues:

I. Whether the testimony of witnesses Rowe and Thomas should have been excluded as being the tainted products of the unlawful seizure of the checkbook from appellant's automobile.

II. Whether the authorization to search the accused's barracks room was based on probable cause.

The appellant and Airman McGlory occupied the same room in the barracks. On the strength of information that McGlory was involved in a larceny, the room, excluding that portion occupied by the appellant, was searched. A quantity of drug-related paraphernalia and 10 stolen credit cards were discovered in a heating duct located inside and above the entrance to the room.[2] Following that discovery, the appellant was found in the day room and was apprehended for "possession of drug paraphernalia and stolen credit cards." A search of his person revealed a pawn ticket and a quantity of hashish wrapped in white paper in his billfold. Authority was obtained to search the appellant's portion of the room and his personal belongings, as well as his automobile. The search of the room revealed a billfold belonging to the appellant which contained two traffic citations issued in the name of Ronald Carswell.[3] During an ancillary search of the appellant's automobile, a checkbook of blank checks bearing the preprinted name of Kenneth K. Rowe was found in the glove compartment. The following morning Rowe was notified that a checkbook purportedly belonging to him had been discovered in the appellant's possession. Rowe confirmed that his checkbook was missing and, for the first time, disclosed that the apartment he shared with one Thomas had been burglarized some 2 months earlier. Rowe identified the checkbook as his, indicating that it had no doubt been stolen along with other items, belonging to both Rowe and Thomas, all of which are the subject matter of specification 1, Charge I. Rowe informed the investigating agent that none of these items had previously been reported stolen. He thought it would be of no avail.

At trial, the military judge ruled that the search of the automobile was illegal for lack of probable cause and excluded Rowe's checkbook from evidence. He, however, allowed Rowe and Thomas to testify concerning their loss and to identify the property belonging to them.

The Court of Military Review was unanimous in its holding that the military judge correctly ruled that the search of the appellant's automobile was illegal and the checkbook inadmissible in evidence. The judges were equally divided, however, on the question of whether Rowe's disclosure of the property thefts from his room, as well as the subsequent testimony of both Rowe and Thomas, were the tainted products of the unlawful seizure of the checkbook.[4]

The exclusionary rule has traditionally barred from trial evidence obtained either during or as the direct result of an unlawful intrusion. Wong Sun v United States, 371 US 471 (1963); paragraph 152, Manual for Courts-Martial, United States, 1969 (Rev). See also

---

[1] Appellant was acquitted of one specification alleging possession of heroin (specification 1, Charge II).

[2] The heating duct was readily accessible to both occupants of the room.

[3] The searching investigator, Special Agent Rogers, was at that time aware that a stolen government adding machine had been pawned a few days previously by a Ronald Carswell (specification 2, Charge I).

[4] By virtue of the fact that the voting composition of the Court of Military Review consisted of six judges, the evenly divided vote resulted in affirmance of the appellant's conviction of specification 1, Charge I, by operation of law.

United States v Armstrong, 22 USCMA 438, 47 CMR 479 (1973); United States v Atkins, 22 USCMA 244, 46 CMR 244(1973); United States v Moore, 19 USCMA 586, 42 CMR 188 (1970). The test for admissibility is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun,* supra at 488.

Differing interpretations of the meaning of *Wong Sun* is basic to the division between the judges of the Court of Military Review. These judges who believed the testimony of Rowe and Thomas untainted, acknowledged that "the Government did not, indeed could not, show that Agent Rogers did, *in fact,* learn of the thefts alleged in Specification 1 of Charge I from a source independent of the unlawfully seized checkbook." They concluded, however, that "the unlawful seizure did no more than accelerate what would otherwise have been the inevitable discovery of those thefts." The dissenting judges held that even assuming the evidence might otherwise have been discovered, " 'nothing short of a showing by the Government that the evidence was, in fact, obtained from an untainted source will negate the "exploitation" evil at which the exclusionary rule is directed.' "

We agree with the interpretation of *Wong Sun* held by the dissenting judges of the Court of Military Review. United States v Atkins, supra, and United States v Moore, supra. See also United States v Armstrong, supra.

An unlawful interrogation[5] of Atkins led to his arrest and the search of his person which resulted in the disclosure that he was in possession of marihuana and heroin. The defense maintained that the contraband was inadmissible on the ground that without the unlawful interrogation Atkins would not have been apprehended and searched. In rejecting the Government's contention that to so hold would be an application of the *but for* test regarding tainted government activities that was rejected by the Supreme Court in *Wong Sun,* and holding the evidence inadmissible, we said:

In the present case, we entertain no doubt that the apprehension and search incident to it was a direct exploitation of the accused's unwarned statement. Martin testified to this effect when he stated there would have otherwise been no reason to apprehend the accused. Evidently he did not regard the other circumstances he had observed as enough to amount to probable cause for taking the accused into custody. Cf. United States v Alston, 20 USCMA 581, 44 CMR 11 (1971). This is not an application of the "but for" principle but one of reliance by the Government's agent upon an improperly obtained admission as the controlling factor in obtaining direct evidence of the accused's guilt. Wong Sun v United States, supra.

United States v Atkins, 22 USCMA at 246, 46 CMR at 246.

In *Moore,* an illegal search of that accused's barracks room produced a letter from a Sergeant Lindsay which related to trafficking in marihuana.[6] When Lindsay was interviewed in Thailand he consented to a search of his quarters. Agents found an envelope (Prosecution Exhibit 1) addressed to Lindsay that bore Moore's return address. The accompanying letter (Prosecution Exhibit 2), signed with Moore's known nickname, contained information disclosing Moore's interest in obtaining amphetamines

---

[5] Martin, an MP in Vietnam, heard automatic weapon fire and discovered a rifle which had obviously been fired earlier near Atkins who was then asleep. Although Martin then suspected Atkins of the offense of unlawfully discharging a firearm, he did not warn him of his right to silence before inquiring of At-

kins whether the rifle was his. Atkins replied in the affirmative. Martin then advised Atkins of his rights and again questioned him. Atkins once again stated the rifle was his and that he had fired it accidentially.

[6] This letter was not introduced in evidence.

through Lindsay.[7] Over defense objection, Prosecution Exhibits 1 and 2 were admitted in evidence. In holding these exhibits inadmissible, we stated:

> The record in the instant case refutes any contention that OSI agents acquired knowledge of Prosecution Exhibits 1 and 2 through information derived from a source other than the unwarranted search of Moore's barracks room. This evidence is not from an "independent source," and the relationship between the initial search and the subsequent discovery is not so "attenuated" as to eradicate the resulting taint.

United States v Moore, supra at 589–90, 42 CMR at 191–92.

The exclusionary rule is discussed in paragraph 152, MCM, as follows:

> Evidence is considered as having been obtained as a result of the illegal acts only if it has been acquired by an exploitation of those acts instead of by means sufficiently distinguishable to be purged of the taint of the illegality.

■ In our view, *Wong Sun* and the Manual stand for the proposition that where evidence has been obtained by exploitation of an unlawful search, the Government must affirmatively establish that the evidence was *in fact* discovered by a means independent of the illegality. It is not enough that it *could have been* so discovered. United States v Atkins, supra, and United States v Moore, supra.

■ Since, in the case at bar, the Government did not, indeed could not, show that it learned of the thefts alleged in specification 1, Charge I, from a source independent of the unlawfully seized checkbook, the testimony of witnesses Rowe and Thomas relative thereto should have been excluded.

We have no difficulty in holding that the search of the appellant's barracks room was based on probable cause.

When the stolen credit cards[8] and the narcotics paraphernalia were discovered in the heating duct of the room shared by both McGlory and the appellant, a place readily accessible to both men, attention moved to the appellant who was then apprehended. The discovery that he was in possession of a quantity of hashish served as a further basis for a request to conduct a search of that portion of the room occupied by the appellant.

■ We believe that this information was sufficient to satisfy the requirement of probable cause. United States v Summers, 13 USCMA 573, 33 CMR 105 (1963). In *Summers,* the police were aware of an unresolved larceny of several .45-caliber pistols. Security police, while on night patrol, stopped to examine a parked automobile occupied by Summers and a companion. When a .45-caliber pistol was observed under the front seat of the automobile, both occupants were apprehended on *suspicion of larceny.* While the principal issue in *Summers* was the reasonableness of the search of the car, which we held to be lawful, implicit in our affirmance of Summers' conviction for larceny, was the clear recognition of the legality of Summers' apprehension.

In this case, while the stolen credit cards and the narcotics paraphernalia could not be linked *exclusively* to Peurifoy, both Peurifoy and McGlory had equal access to the hiding place and *together* their access was exclusive. Under these circumstances, we believe a further search of the room was warranted.

That portion of the decision of the Court of Military Review affirming the appellant's conviction of specification 1, Charge I, is reversed and the specification ordered dismissed. The record of trial is returned to the Judge Advocate General of the Air Force. The Court of Military Review may reassess the sentence on the basis of the remaining findings of guilty.

Chief Judge DARDEN concurs.

---

[7] Moore was convicted of soliciting Lindsay to disobey a lawful regulation by requesting Lindsay to obtain and transfer amphetamines to Moore.

[8] Sergeant Lockhart, one of the searchers, knew the credit cards were stolen because he had previously investigated their theft.

QUINN, Judge (concurring in part and dissenting in part):

Putting aside my dissents in United States v Armstrong, 22 USCMA 438, 47 CMR 479 (1973) and in United States v Moore, 19 USCMA 586, 42 CMR 188 (1970), and assuming that the search of the accused's car was unlawful, in my opinion evidence other than the discovery of Rowe's checkpad would have led the law enforcement authorities to Rowe and Thomas.

The accused's car was searched on May 12, 1972. Earlier, Agent Rogers had learned that some forged checks on Thomas' bank account had been cashed by a Ronald Carswell. He also knew that a government adding machine had been stolen from Langley Air Force Base and pawned by a Ronald Carswell, and he had determined that only one person of that name was in the Air Force, but he was stationed in a different state. Consequently, when Agent Rogers discovered the two traffic citations in the name of Ronald Carswell in the accused's possession, he was confronted with a link between the accused and Ronald Carswell that dictated further investigation. In fact, Rogers testified that he seized the traffic citations because he believed they indicated "that Ronald Peurifoy used the name Ronald Carswell." Thus, the accused was connected with the Thomas check forgeries and with the pawning of stolen property before his car was searched. From the moment of that connection, common sense and sound police practice demanded that the connections be investigated. I have no doubt whatever that the investigation would have disclosed, as the evidence demonstrates it did, that other property pawned by Ronald Carswell had been stolen from Thomas and Rowe. I cannot conclude with the majority, therefore, that the checkbook obtained in the subsequent search of accused's car was the "controlling factor" in procurement of testimony by Thomas and Rowe. Cf. United States v Atkins, 22 USCMA 244, 246, 46 CMR 244, 246 (1973). In my opinion, the checkbook was only the last link added to an existing chain of evidence that led directly and necessarily to Thomas and Rowe. As contended by the Government, this situation clearly falls within the scope of the evolving doctrine of "inevitable discovery," see People v Fitzpatrick, 32 NY2d 499 (1973), cert denied, 42 USLW 3304 (US Nov 19, 1973), and within the contention of the now Chief Justice Burger in Smith v United States, 324 F2d 879, 888 (1963), cert denied, 377 US 954 (1963), that the taint doctrine does not apply to testimony of a willing witness. However, I need not decide whether either or both conceptions are justified by the Fourth Amendment. I am satisfied that the mistaken seizure of the checkpad could not, and did not, immunize the accused from the consequences of the weight of evidence that had been amassed against him before the search so that the government's procurement of the testimony of Thomas and Rowe did not result from the kind of exploitation of illegally seized evidence condemned in Wong Sun v United States, 371 US 471 (1963).

I would sustain the trial judge's determination that the testimony of Rowe and Thomas was obtained through lawful means sufficiently independent of the checkpad to satisfy constitutional requirements, and I would affirm the decision of the Court of Military Review.